Charles MAGIDS, Individually and as Independent Executor of the Estate of Fannie Magids, Deceased, Appellant,

v.

AMERICAN TITLE INSURANCE COMPANY, MIAMI, FLORIDA, et al., Appellees.

No. 15674.

Court of Civil Appeals of Texas, Houston (1st Dist.).

July 16, 1970.

Rehearing Denied Oct. 29, 1970.

Schlanger, Cook & Cohn, Joel W. Cook, Houston, for appellant and cross-appellee.

Butler, Binion, Rice, Cook & Knapp; Fletcher Etheridge, Houston, for Houston First Sav. Ass'n and American Title Ins. Co., Miami, Florida.

COLEMAN, Justice.

Charles Magids, individually and as executor, brought suit against his son Barnett Magids, American Title Insurance Co., and numerous other persons and corporations, to remove the cloud on the title of certain described properties owned by appellant and his deceased wife, created by certain instruments alleged to be forgeries. On this appeal only one of these tracts of land, referred to as the Glendale property, is involved. After a trial to a jury the trial court entered his judgment disregarding the answers to certain issues and setting aside certain deeds found to be forged, including a deed purporting to be a conveyance of the Glendale property from Charles Magids and wife to Barnett Magids, and certain deeds of trust, including one from Barnett Magids conveying the Glendale property to L. H. Allen, trustee, to secure a loan made by Houston First Savings Association to Barnett Magids. The court found that Barnett Magids took a ⅙ undivided interest in the Glendale property, subject to a life estate in Charles Magids, under the will of his mother, and that this interest was subject to the lien acquired by Houston First Savings Association by reason of the covenants contained in the trustee's deed and under the doctrine of after-acquired title. Houston First Savings Association had assigned its interest to American Title Insurance Co. The judgment decreed a foreclosure of the lien. Other pertinent provisions of the judgment will be discussed in the course of the opinion. Both American Title Insurance Company and Charles Magids have appealed.

American Title contended in the trial court that Charles Magids and his wife Fannie Magids had executed mutual and reciprocal wills. Neither of these wills

had been revoked on the date of Fannie Magids death. Charles Magids offered the will of Fannie Magids for probate and qualified as independent executor of her estate. Charles Magids has executed a new will revoking his previous will. American Title contends that this action cannot avoid the contract between Charles and Fannie Magids to devise their property as set out in the will of Fannie Magids. American Title further contends that by reason of the contractual provisions of the wills Barnett Magids took a vested remainder interest in ⅓ of the Glendale property, subject to the life estate in Charles Magids and subject to defeasance by the death of Barnett Magids prior to the death of Charles Magids, and that the trial court erred in decreeing foreclosure on only a ⅙ undivided interest subject to the life estate.

The jury found in answer to the first three issues that Charles Magids and Fannie Magids orally agreed, each in consideration of the other doing likewise, to execute wills providing that each would leave his (her) property to the other for life with the remainder as provided in Fannie Magids' will; that Fannie Magids executed said will pursuant to such agreement; and that Charles Magids executed his will pursuant to such agreement. The jury failed to find that "Charles Magids made a contract with Fannie Nelkin Magids that he would not revoke the will inquired about in Special Issue No. 1."

By her will Mrs. Magids provided that if her husband survived her she gave to him for life all of the property which she then possessed. She provided that on his death the title to such property should vest in their three sons, share and share alike. She provided that if any of the children died without issue before her husband's death his share should vest in the survivors, but if one should die leaving issue his share would vest in such issue. She then provided: "It is my intention in this paragraph to create a life estate in all my property (both real and personal) for the benefit of my husband with the remainder to

the three named beneficiaries or their issue."

In the following paragraph she provided: "If my husband dies before me, I give * * * my entire estate, whether real or personal and wherever situated, in fee simple absolute, to such of my children or their descendants as are living at the time of my death. My children shall take per capita and their descendants per stirpes."

She then named her husband independent executor; provided for substitute executors; provided that the executor should make no charge for his services as executor; authorized the executor "to sell, dispose of, deliver, and convey any portion of my estate, real or personal, at public or private sale, for any price, and on such terms as he shall deem advisable, for the purpose of paying taxes, debts, or expenses of administration."

On direct examination Mr. Charles Magids was questioned with reference to the discussions had with Mrs. Magids prior to and at the time of the execution of her will. He testified that she told him that Barnett, their oldest son, had told her that, by reason of the wills she and his father had previously executed, the children would have to pay inheritance tax twice. These wills were identical handwritten wills by the terms of which each left all of his (or her) property to the other. Mr. Magids testified that on discussing the matter with his accountant he found Barnett's information correct and that he conveyed this information to his wife. She then stated to him: "Would you kindly see to it that someone should draw up another will for me?" He testified: "She was just talking about her will. My will was not mentioned at all because there was no contract between us and no agreement because we always talked about things. We never had no contract in our whole life."

In reply to a question relative to discussions concerning the right to revoke the will, Mr. Magids testified: "Well, we talked about it all the time and when we talked

about it I would say, 'Honey, there is no use talking about wills.' I tell her that if I go away before her that she can change her will any time she wishes and that it was also said by her to me many times, she said, 'If I go before you do you can do anything you want.' * * * our position in the whole thing was we didn't think nothing else about our children and our grandchildren." He testified that every time they talked about who should receive the property on their death it was "our children" and "our grandchildren".

Mr. Magids testified that when the will was prepared he took it to his wife and that she signed it in February, 1964, but that he did not sign his will on that occasion.

The title company placed in evidence certain testimony given by Mr. Magids on deposition. He testified that a lawyer prepared the wills for his wife and for him at the same time. He talked to the lawyer by telephone and instructed him that the wills should be the "same thing". After the wills were prepared the lawyer brought them out to his house, and at that time he talked with Mrs. Magids. He signed his will at the same time Mrs. Magids signed her will. Mr. and Mrs. Farber witnessed both wills. The terms of his will were the same as those of his wife's will.

These questions were asked and the answers following were given:

"Question: Were the provisions of your will, the one you say you have destroyed, identical to those of your wife's?

"Answer: Same thing.

" * * *

"Question: And you and your wife agreed that that is what you wanted to do?

"Answer: Yes. We always discuss that. I even have a previous will that we agreed to everything should go to the children.

"Question: And each time that each of you executed a will during your married life, you agreed that the two of you would leave the estate the same way?

"Answer: That's right.

"Question: And you agreed that way at the time you executed this particular will?

"Answer: Oh, yes.

" * * *

"Question: And she knew at that time that your agreement was that you would execute the same will and that would be the disposition of your estate? Is that correct?

"Answer: That's right, at that time.

"Question: Well, she died before you changed your will, didn't she?

"Answer: She died before I changed my will. I changed my will, because it was necessary.

"Question: At all times during her lifetime the will which you agreed with her that you would have in effect was in effect? Is that correct?

"Answer: That she was living?

"Question: Yes.

"Answer: Yes.

"Question: All right. What did you and your wife discuss about making those wills? We'll just go into the details.

"MR. COOK: All right.

"Answer: We wanted our children to have it.

"Question: You always agreed that you would give her a life estate and she would give you her life estate?

"Answer: Yes.

"Question: And after your life estate, you got to use her property for life and then all of the property would go to the children? Is that right?

"Answer: Yes.

"Question: And that was your agreement?

"Answer: Yes."

There was testimony that Mr. Magids was born in Poland in 1901. He received Polish, Russian and German education. He did not finish school because of World War I. He did continue to receive private lessons. He came to the United States in 1924 and studied English in night school for about three months. He said: " * * * Mostly my education is from common sense point of view. I picked it up myself." He attended lectures at the Y.M.C.A. in 1963 and 1964 to help his understanding of the English language.

In explanation of his use of the word "agreed" in his deposition Mr. Magids said: "Agreed? Well, in my home there was never such a thing as agreement or contract. We always we decided and when I said agreement I didn't mean exactly agreement; I meant decided."

He also testified: "There was nothing never said that we should have the same kind of wills after our death. We should maybe have the same kind of will while we are alive but if she goes away before I do I can change my will any way I want to and to be nice that is the same thing I told her, that if I happened to go away before she did she will be able to do the same thing and * * *"

On February 23, 1964, when the will was executed, Mrs. Magids was seriously ill. She died June 28, 1964, some four months after the will was signed. Mr. Farber, a witness to the will, testified that he knew at that time that she was "passing," "did not have long to live." He did not remember the people present, or any conversation other than the fact that Mr. Magids "had the paper and he wanted her to sign it and us to sign it at the same time." He didn't remember any discussion of Mr. Magids' will and did not remember witnessing his will or signing his name more than one time. The will which Mr. Magids did execute at some time prior to his wife's death was not produced at the trial.

■ Mr. Magids offered into evidence portions of his testimony taken by deposition in 1965 where he stated, consistent with his testimony at the trial, that he and his wife had stated to the other that the wills could be changed. Objections to this testimony, on the ground that it was given in response to leading questions, were sustained. Magids contends that in so ruling the trial court erred. The testimony given at the trial was not impeached directly, and, if at all, only by implication from the testimony that Mr. and Mrs. Magids had "agreed" on the making of identical wills. The only effect of the admission of the rejected testimony would be to attempt to bolster the witness' credibility. The objection made was well taken and the trial judge did not abuse his discretion by sustaining it.

■ Certain testimony of Jack Magids, a son, was rejected as constituting testimony concerning a transaction with a decedent in violation of Article 3719, R.C. S., the so-called "dead man's statute". This article was considered in Hall v. Collins, 151 S.W.2d 338 (Tex.Civ.App.— Amarillo 1941, error ref.), where the court said: " * * * In applying the statutory rule the courts will consider the nature of the suit and the relative interest of the party rather than the position he may happen to occupy on the record. 12 Encyclopedia of Evidence 762. It has been settled in this State that when it appears 'that the interests of parties nominally arrayed on opposite sides are in fact identical or allied, neither party will be permitted to call the other to testify as to a transaction with the decedent.' 14 Tex.Jur. 330, para. 544;

Rascoe v. Walker-Smith Co., 98 Tex. 565, 86 S.W. 728; James et al. v. James et al., 81 Tex. 373, 16 S.W. 1087. * * * "

Jack S. Magids, a minor, was made a party defendant by Houston First Savings Association, who claimed a valid first lien on all the Glendale property by virtue of certain instruments found on the trial to have been forgeries. In the alternative Houston First Savings Association contended that under the wills of Charles Magids and his deceased wife, Barnett Magids took a vested remainder interest in the Glendale property, on which it had a valid lien. On the issue of the legal effect of the wills the interests of Jack Magids and Barnett Magids were identical, and thus the interests of Jack Magids and of Houston First Savings Association, as well as American Title Insurance Co., were identical. On this issue the interest of Charles Magids was adverse to that of his son, Jack Magids. An answer was filed on behalf of Jack Magids by his attorney ad litem adopting the allegations of the cross-action of Houston First Savings Association relating to the wills. After he reached the age of twenty-one Jack Magids employed the attorney representing his father, who filed on his behalf an answer consisting of a general denial. While it is apparent that he was not hostile to his father, his legal interest was clearly adverse on the issue as to which he was called to testify by his father. The fact that he was a friendly witness is of no significance. It has long been held that an heir may remove himself from the bar of the statute by disclaiming interest in the estate in good faith, or by divesting himself of all interest in the estate. May v. Brown, 144 Tex. 350, 190 S.W.2d 715, 165 A.L.R. 1180 (1945).

At the time Mrs. Magids' will was prepared and executed, Jack Magids was a junior in high school and was living with his parents. His excluded testimony was preserved by a bill of exceptions. He testified that he was present when his mother executed her will; that she said nothing to his father about his will; that his father did not execute a will in his presence at that time and, as far as he knew, did not execute a will on that occasion. Within a few days prior to this occasion he heard a conversation between his father and mother in which his mother said: "Don't you think it might be better if we had some more wills?" To this his father replied: "You go ahead and sign your will. You can change your will at any time and I can change my will at any time." He also stated: " * * * There was in fact conversation about the will between my mother and father previous to the time I mentioned; however I cannot testify that there was ever specific discussion about similar wills between my father and my mother."

This testimony was material and was relevant to a closely contested issue. The trial court erred in excluding it. The error, however, is not material because the trial court disregarded the answers to the special issues dealing with contractual wills, unless the court also erred in that regard. There was evidence to support the answers made by the jury. The issue, in answer to which the jury failed to find that there was not an agreement that the wills would be irrevocable, was immaterial. The answers to the previous issues established a contract which was irrevocable after the death of Mrs. Magids unless the agreement provided otherwise. No matter how this issue was answered, the answer could not establish an agreement that Mr. Magids could effectively revoke his will after the death of Mrs. Magids. The error of the trial court in disregarding material issues requires that the judgment be reversed.

In Wagnon v. Wagnon, 16 S.W.2d 366 (Tex.Civ.App.—Austin 1929, error ref.), the court held that the fact that wills of a husband and wife are both executed at the same time, before the same witnesses, and are both of the same tenor and strictly mutual in their terms was no proof that the wills were mutual.

This rule was recognized in Nye v. Bradford, 144 Tex. 618, 193 S.W.2d 165 (1946), where the court added that "the

will may, by its terms or in its recitals, conclusively prove or tend to prove that it is based on or executed in furtherance of agreement." In Bradford a witness to a will testified without objection that the testator and his wife, who had by previous wills disinherited a daughter, had forgiven her and "had agreed at that time that they were going to treat their children exactly alike." The court said: "This is not merely testimony as to a declaration made by the testators; it is direct evidence that the agreement was in fact made at the time the will was executed."

The terms of Mrs. Magids' will are not so unusual or distinctive as to compel a belief that it could not have been made without a previous agreement between Mr. and Mrs. Magids as was the case in Nye v. Bradford, supra, and Murphy v. Slaton, 154 Tex. 35, 273 S.W.2d 588 (1954), where joint wills were considered.

■ The answers to the issues finding that the wills were executed pursuant to an agreement rest almost exclusively on Charles Magids' deposition testimony to the effect that he "agreed" with his wife to make identical wills. The jury disregarded his explanation as to what he meant by the word. By reason of the exclusion of the testimony of Jack Magids, and because the question of whether there was included in the agreement to make mutual and reciprocal wills a right on the part of Charles Magids to revoke the will which he executed pursuant to such agreement, if any, was not properly submitted to the jury, the justice of the case requires that the cause be remanded for a new trial. Praetorian Mutual Life Ins. Co. v. Sherman, Tex., 455 S.W.2d 201 (1970); Hicks v. Matthews, 153 Tex. 177, 266 S.W.2d 846 (1954).

American Title also contends that the trial court erred in refusing to enter judgment establishing its right to a lien on a ⅙ vested remainder interest in the Glendale property out of Charles Magids' community interest as well as the ⅙ vested remainder interest out of Fannie Magids' community interest as required by the jury verdict. In the event it is established on a new trial that Charles and Fannie Magids executed their wills pursuant to an agreement contractual in nature, it will follow that Charles Magids has lost all power to effectively revoke his will. In that event the rights of each of his children in all property owned by Charles and Fannie Magids, or either of them, at the time of the death of Fannie Magids, has vested. Kirk v. Beard, 162 Tex. 144, 345 S.W.2d 267 (1961); Weidner v. Crowther, 157 Tex. 240, 301 S.W.2d 621 (1957); Murphy v. Slaton, 154 Tex. 35, 273 S.W.2d 588 (Tex. 1954); Wagnon v. Wagnon, 16 S.W.2d ref.); Caples v. Ward, 107 Tex. 341, 179 366 (Tex.Civ.App.—Austin 1929, error S.W. 856 (1915).

■ An issue was developed in the pleadings as to whether Charles Magids, in his capacity as executor of the will of Fannie Magids, had the right to sell the Glendale property, free of the lien owned by American Title, for the purpose of paying taxes, or claims against the estate, including a claim due to the estate from Barnett Magids. The trial court ruled that it had no jurisdiction to decide these issues. This controversy involves construction of the will of Fannie Magids, as well as the equitable doctrine of marshaling of assets. The estate is in the hands of an independent executor. There was a plea for declaratory relief. The trial court had jurisdiction to determine the matters in controversy. Griggs v. Brewster, 122 Tex. 588, 62 S.W. 2d 980 (1933); Pinkston v. Pinkston, 254 S.W.2d 196 (Tex.Civ.App.—Waco 1953, err. ref., n. r. e.); Metting v. Metting, 431 S.W. 2d 906 (Tex.Civ.App.—San Antonio 1968).

■ Charles Magids presents a counterpoint complaining of the action of the trial court in refusing to define the word

"agreed" used in Special Issue No. 1. The issue might have been worded in such a manner as to direct the attention of the jury to the necessity for contractual intent on the part of the parties to the agreement. The objection made does not present this question directly. The point does not present error. Pullen v. Russ, 226 S.W. 2d 876 (Tex.Civ.App.—Ft. Worth 1950, writ ref., n. r. e.).

 Charles Magids has excepted to that portion of the judgment assessing against him individually and as independent executor one-half of the fees allowed to the attorneys and guardians ad litem. Since the case must be reversed, in part, and additional work on part of the guardians and attorney ad litem will be required, this part of the judgment will be reversed as between American Title Insurance Company and Charles Magids, individually and as Independent Executor of the Estate of Fannie Magids, deceased, in order to permit the trial court to tax costs considering the additional work required, and judgment rendered on the issues remanded.

Only American Title Insurance Company, Houston First Savings Association, Security Title and Trust Company, University Savings and Loan Association and Charles Magids have appealed. Security Title and Trust Company and University Savings and Loan Association have settled with the parties adversely interested and a separate judgment has been entered in that connection. American Title Insurance Company and Houston First Savings Association are interested only in the Glendale property. The judgment of the trial court is affirmed except insofar as it relates to the rights of the parties to the community ½ interest of Charles Magids in the Glendale property under the purported agreement between Charles Magids and Fannie Magids to make mutual wills devising the property as set out in Fannie Magids' will; insofar as it taxes the attorneys' fees; and insofar as the court failed to act on the prayers for de-claratory relief of Charles Magids and of American Title Insurance Company, Miami, Florida. The judgment in the respects noted in the above exceptions, is reversed and remanded.